UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| ENCYCLOPAEDIA BRITANNICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> DICKSTEIN SHAPIRO LLP, <br><br> Defendant. | Civil Case No. 10-454 (RCL) |

## MEMORANDUM OPINION

The patents at issue in this case cover multimedia systems for retrieving textual and graphical information. The question before the Court is whether these claims are patent eligible under 35 U.S.C. § 101, or are instead drawn to a patent-ineligible abstract idea. The parties agree that the § 101 issue is properly before the Court and may be addressed pursuant to a motion for judgment on the pleadings under Rule 12(c).

### I. BACKGROUND

#### A. Procedural History

In 2006, plaintiff Encyclopaedia Britannica, Inc. ("EB") sued several companies for alleged infringement of United States Patent Nos. 7,051,018 (the " '018 patent") and 7,082,437 (the " '437 patent"). Compl. ¶ 7. Both patents were held invalid in Texas District Court because of a previously unnoticed defect in an earlier patent application filed in 1993. *Id.* ¶¶ 10-11 & Ex. B. EB then sued Dickstein Shapiro, the law firm that had prosecuted the 1993 application on EB's behalf before the Patent and Trademark Office ("PTO"), for malpractice. EB contends that but for

the defect in the 1993 application, the '018 and '437 patents would have been valid and that it would have won its infringement case. This Court has previously held that under the "case-within-a-case" principle that governs malpractice claims, EB must prove the merits of its underlying patent claims in order to show that the alleged malpractice actually caused it some injury. *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 905 F. Supp. 2d 150, 153-54 (D.D.C. 2012). Accordingly, the parties have briefed issues relating to claim construction and questions of validity under 35 U.S.C. § 112.

While those issues have remained pending, there have been developments in patent law that Dickstein Shapiro alleges are "fatal" to EB's malpractice claim, regardless of how the disputed claim terms are construed. In *Alice Corporation Party Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), the Supreme Court held that claims directed to abstract ideas are not eligible for patent protection under § 101, and that "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. Dickstein Shapiro argues that applying the principles set forth in *Alice*, "the asserted claims of the '437 and '018 patents are invalid as a matter of law because they merely recite computerized implementation of abstract ideas." Def.'s Mem. in Supp. of Mot. for J. on the Pleadings Based Upon Lack of Patent-Eligible Subject Matter ("Def.'s Mot.") at 2. If true, EB cannot prove the case-within-a-case, and Dickstein Shapiro is entitled to judgment on the pleadings. *See, e.g., Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. Dec. 23, 2014) (affirming district court's ruling on § 101 issues based solely on the pleadings, without claim construction, discovery, or expert reports).

## B. The Patents at Issue

Dickstein Shapiro has provided a helpful overview of the patents at issue. Because EB did not dispute this factual summary or provide an alternative, and because the Court finds it succinct and accurate, it is largely reproduced as follows.

The '018 and '437 patents both derive from the same original patent application and share a common specification. As described in the body of the specification, the invention is a computerized encyclopedia containing both textual articles and graphical images (e.g., photographs and charts). A user can search the encyclopedia by selecting one of several "entry paths" from a main menu screen. For example, the "Topic Tree" entry path allows a user to browse through a list of topics and subtopics and then retrieve articles of interest. '437 Patent at 7:13-19. The "Idea Search" entry path allows a user to enter terms to search for in the database, and then generates a list of article titles relevant to the search request, from which the user can select an article for retrieval. *Id.* at 6:61-65. And the "Picture Explorer" entry path allows a user to search for pictures in the encyclopedia database, either by randomly browsing through a collection of pictures or browsing or searching through a list of picture captions and selecting a picture for retrieval. *Id.* at 7:4-12

As described in the specification, the invention also includes a "World Atlas" entry path. *Id.* at 7:24-32. When this option is selected, the computer will display a map of the Western Hemisphere. *Id.* at 19:19-20. The user can then zoom in on particular regions or pan the map in a particular direction. *Id.* at 19:20-26. Places on the map are marked with place names (if the "Labels" feature is turned on) and with symbols (e.g., a circle for a city or a star for a state capital) as on a conventional map. *Id.* at 19:27-30, 20:54-58. The user can select a place name (e.g., by

clicking with a mouse) and retrieve a list of articles related to that place. *Id.* at 19:30-35. In addition, the user can search for a place, either by browsing through a list of place names or entering the place name in a search box to generate a list of place names. Upon selecting a place name, a map showing that place will be displayed. *Id.* at 19:60-20:14.

The specification states that other variations on the invention are possible. "More particularly, it is contemplated that this invention can be used with any information that can be stored in a database. While the present invention has largely been described with reference to an encyclopaedia, other databases of published graphical or textual information could be included." *Id.* at 22:23-28.

Both patents include "method" claims, which recite a series of steps, and analogous "system" claims, which are directed to a computer-readable medium containing software that can perform the steps of the claimed method. EB has asserted that the claims that are infringed are claims 29 and 30 of the '437 patent and claims 96 and 113 of the '018 patent, and these claims are representative of the independent claims of the two patents.

Claim 29 of the '437 patent recites:

29. A machine-implemented method for retrieving information, comprising:

storing textual information and graphical information of any type on a computer-readable medium in at least one database;

providing a plurality of entry paths for searching at least a portion of the stored textual and graphical information, the entry paths comprising:

at least one textual browse entry path allowing a user to select textual information from a predetermined list of textual information;

at least one textual search entry path allowing a user to enter text to search for in the stored textual information; and

at least one graphics entry path for graphically searching at least a portion of the graphical information;

retrieving textual information based on input of the user in the textual browse entry path or the textual search entry path;

4

providing a first indicator associated with the retrieved textual information indicating the availability of associated graphical information;

retrieving the associated graphical information in response to input of the user associated with the first indicator;

retrieving graphical information based on input of the user in the graphics entry path;

providing a second indicator associated with the retrieved graphical information indicating the availability of associated textual information; and

retrieving the associated textual information in response to input of the user associated with the second indicator.

Claim 30 is the analogous system claim. It is directed to "[s]oftware for retrieving information, the software embodied on a computer-readable medium, and when executed by a computer, operable to" perform essentially the same steps recited in Claim 29. Thus both of these claims are generally directed toward (1) storing textual and graphical information in a database, (2) searching for information using the different "entry paths" described, and (3) retrieving items of information from the database.

By contrast, the '018 patent focuses on maps. For example, Claim 113 recites:

113. A method of electronically using a map, comprising:
causing an image of at least a portion of a map to be displayed on a display screen; changing the portion of the map displayed on the display screen in response to user input;

displaying a plurality of place indicators on the display screen, wherein a specific place indicator indicates the position of a place on the map and indicates that further information about the place is available;

displaying text information associated with a first one of the plurality of place indicators in response to input from a user indicating selection of the first place indicator;

providing a text search feature that allows the user to enter textual search information to search for a first place, receive a first list of places in response to the search, select a first place from the first list of places, and display an image of a part of the map indicating the location of the first place in response to input from the user; and

providing a text browse feature that allows the user to browse a second list of places, select a second place from the second list, and display an image of a part

5

of the map indicating the location of the second place in response to input from the user.

Claim 96 is the analogous system claim. It is directed to a "computerized map system," comprising a "computer readable storage medium" and "computer software stored on the storage medium and operable to" perform essentially the same steps recited in Claim 118. Thus both of these claims are generally directed toward (1) viewing a map, (2) displaying information about places on the map based on a user's selection of a place indicator, and (3) finding places on the map using the "text search" and "text browse" features.

## II. LEGAL STANDARDS

### A. Standard of Review

Federal Rule of Civil Procedure 12 allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12. The motion should be granted "if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Stewart v. Evans,* 275 F.3d 1126, 1132 (D.C. Cir. 2002) (internal citation and quotation marks omitted). A court reviewing a Rule 12 motion should "accept as true the allegations in the opponent's pleadings and accord the benefit of all reasonable inferences to the non-moving party." *Id.* (internal citation and quotation marks omitted).

### B. Section 101

Section 101 of the Patent Act defines the subject matter eligible for patent protection. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court "has long held that this provision contains an important implicit exception[:] Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad*

6

*Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (citing *Mayo Collaborative Svcs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 2116 (2012)). The Supreme Court "ha[s] interpreted § 101 and its predecessors in light of this exception for more than 150 years." *Alice*, 134 S. Ct. at 2354 (citing *Bilski v. Kappos*, 130 S. Ct. 3218 (2010)). This is because laws of nature, natural phenomena, and abstract ideas are "the basic tools of scientific and technological work" and "monopolization of these tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.* (citations omitted).

At the same time, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* (citing *Mayo*, 132 S. Ct. at 1293-94). "At some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1293-94). "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* (citations omitted). In applying the § 101 exception, the court must "distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Id.* (brackets, quotations, and citations omitted).

In *Alice*, the Supreme Court elaborated upon a test—originally set forth in *Mayo*—for distinguishing patents claiming laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, the court must determine whether the claims are directed to one of those patent-ineligible concepts. If so, the court must consider the elements of each claim both individually and "as an ordered combination" to determine whether additional elements transform that abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2355. The second step "is the search for an 'inventive concept,' or some element or combination

of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). "[A]n inventive concept is, among other things, a new idea that solves a recognized problem in a particular field of endeavor. Moreover, the inventive concept[] . . . involve[s] an innovation that allowed a user of the invention to achieve a *better* result, rather than a result that was achieved more quickly due to the replacement of direct human activity with a computer." *E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, No. 12-cv-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015). *See also Alice*, 134 S. Ct. at 2359 (claims may, for example, "purport to improve the functioning of the computer itself."). It is not sufficient to "simply recite the [abstract concept] as performed by a generic computer." *Id.*

The concern driving this principle is one of preemption. *Alice*, 134 S. Ct. at 2354; *Bilski*, 130 S. Ct. at 3218 (upholding the patent would "pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea"). "[A]bstract ideas are the basic tools of scientific and technological work. Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354 (brackets, quotation marks, and citations omitted).

### III. ANALYSIS

"To prevail in its legal malpractice action under D.C. law, Britannica ultimately has to show, among other things, that Dickstein's actions caused it injury, i.e., that, had it not been for Dickstein's purported malpractice, Britannica would have prevailed in its . . . infringement suit." *Encyclopaedia Britannica*, 905 F. Supp. 2d at 153-54. "This is the so-called 'case within a case' or 'trial within a trial' showing required for malpractice suits under D.C. law." *Id.* at 154.

Therefore, if the patents at issue are invalid for reasons unrelated to the alleged defect in the 1993 application—*i.e.*, if the patents are invalid because they are not directed to eligible subject matter under § 101—then EB cannot meet its burden of demonstrating that Dickstein Shapiro's alleged malpractice caused an injury to EB.

### A. Proper law to apply

The parties agree that the Supreme Court's decision in *Alice* altered the way courts treat claims involving § 101, although they may disagree as to what extent. *See, e.g.*, Pl.'s Mot. at 9; Def.'s Opp'n at 2. However, as an initial matter the Court must decide whether *Alice* (decided in 2014) and other post-2009 legal developments are relevant to this case.

EB argues that "[t]he standard of care by which Dickstein's conduct must be judged and the standard for patentability to be applied to the '018 and '437 patents is that which existed at the time that summary judgment was rendered in the Texas District Court; namely 2009." Def.'s Opp'n at 2. This statement is half correct. EB asserts that to determine malpractice liability, "an attorney's conduct is to be viewed in the context of events prevailing at the time of the alleged malpractice, not in light of subsequent developments." *Id.* (citing *Biomet, Inc. v. Finnegan Henderson, LLP*, 967 A.2d 662, 668 (D.C. 2009)). This, as Dickstein Shapiro concedes, is obviously true, for an attorney cannot be expected to make litigation decisions based on unknown future legal theories. *See* Def.'s Reply at 4 (citing *Biomet Inc. v. Finnegal Henderson LLP*, 967 A.2d 662, 668 (D.C. 2009) (noting that "an attorney is not expected, much less required, to accurately predict developments in the law"). But the attorneys' conduct is not currently before this Court: At this stage of a case within a case inquiry, the Court instead considers simply the whether the patents were otherwise valid.

EB further cites *Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 200 (D.D.C. 2006) as non-binding authority for the proposition that "the law prevailing at the time of the alleged malpractice is that which controls in the case-within-the-case malpractice context." *Id.* But the "standard for patentability" or "law prevailing at the time" is set forth in § 101, which has not changed. *Alice* merely clarified how the courts should properly interpret § 101 as it applies to computer-implemented methods. Indeed, the Supreme Court's decision did not overrule existing law regarding patent-eligibility: The Supreme Court has long held that abstract ideas are unpatentable, and has interpreted § 101 and its predecessors in light of this principle for more than 150 years. *See Alice*, 134 S. Ct. at 2354 (citing *Bilski*, 130 S. Ct. at 3218; *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112-21 (1854); *Le Roy v. Tatham*, 55 U.S. (14 How.) 156, 175 (1853)). *Alice* merely clarified how these longstanding principles should be applied to computer-implemented methods and systems.

When the Supreme Court construes a federal statute such as § 101, that construction is an authoritative statement of what the statute has always meant that applies retroactively. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311-13 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."); *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) (holding that Supreme Court decisions apply to "all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule"); *cf.* 4 Ronald E. Mallen & Allison Martin Rhodes, Legal Malpractice § 37:87 (2015) ("The objective of a trial-within-a-trial is to determine what the result *should* have been (an objective standard), not what the result *would have* been by a particular judge or jury (a subjective standard."). *Alice* represents the Supreme Court's definitive statement on what § 101 means—and

always meant. Because the underlying case is governed by § 101, it is appropriate for this Court to apply the Supreme Court's construction of § 101 as set forth in *Alice*.

Indeed, *Jacobsen* itself explicitly found that while subsequent decisions are not binding on a court's assessment of the state of the law when considering a trial-within-a-trial, "later decisions do help to illuminate the state of the law at the time, particularly when, as here, the subsequent jurisprudence further clarifies a long-standing rule rather than overturns, alters, or undermines it." *Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 196 n.4 (D.D.C. 2006). "Subsequent case law helps explain what 'should have happened.'" *Id.* (citing 4 Legal Malpractice § 33.9).

Furthermore, applying the law as it is currently understood is the only plausible option given the facts of this litigation. EB's argument rests on the premise that if the Texas District Court had not dismissed the underlying litigation at the summary judgment stage in August 2009, it would have proceeded to resolve the § 101 issue at that time based on the case law then in existence. But it is impossible to know exactly when the court would have addressed the § 101 issues had it not granted summary judgment on other grounds. As of August 2009, there had been no claim construction and no significant discovery in the underlying Texas litigation. *See* Dockets 1:06-cv-578 and 1:07-cv-787 (showing no discovery schedule or claim construction). Final resolution of the case may have taken years, as is typical in this type of case. *See, e.g., Alice*, 134 S. Ct. at 2353 (seven years between initial filing and resolution by the Supreme Court); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (over five years between initial filing and final resolution by the Federal Circuit). Because the Court cannot know when the § 101 issue would have been finally adjudicated, the only rule that makes sense in this context is to apply the objectively correct legal standard as enunciated by the Supreme Court in *Alice*, rather than an incorrect legal standard that the Texas District Court may have applied prior to July 2014.

B. **Applying** *Alice*

1. Step One

The Court first must determine whether the claims at issue are directed to a patent-ineligible concept, and concludes that they are: These claims are drawn to the abstract idea of collecting, recognizing, and storing data to be easily found and retrieved.

The "abstract ideas" category embodies "the longstanding rule that an idea of itself is not patentable." *Alice*, 134 S. Ct. at 2355 (quotations and citations omitted). Examples of ideas that the Supreme Court has found too abstract to be patentable are fundamental economic principles, *Bilski*, 561 U.S. at 593, and methods of organizing human activity, *Alice*, 134 S. Ct. at 2356.

The claims of the '437 patent recite the steps of (1) storing textual and graphical information in a database; (2) providing a plurality of "entry paths" to search through the stored information, including "textual browse," "textual search," and "graphical search entry paths;" (3) retrieving textual or graphical information based on the input in one of the entry paths; and (4) further retrieving "associated" graphical information in response to user input associated with an indicator in retrieved graphical information. In other words, the claims are directed to the concept of organizing and storing information in a database, searching for information in the database, and retrieving information from the database.

This abstract concept of collecting, recognizing, and storing data is not patent-eligible. A "database" is nothing more than an organized collection of information. Humans have been collecting and organizing information and storing it in printed form for thousands of years. Indeed, encyclopedias—described as a type of "database" in the specification—have existed for thousands of years. For just as long, humans have organized information so that it could be searched for and retrieved by users: For example, encyclopedias typically are organized in alphabetical order and

12

are searchable using indexes, and articles generally contain cross-references to other articles on similar topics. These activities long predate the advent of computers. Such fundamental human activities are "abstract ideas" beyond the scope of § 101.

Likewise, the '018 claims recite the steps of (1) displaying a map on a display screen and changing the portion of the map being displayed in response to user input, (2) displaying "place indicators" on the map indicating the location of a place and the availability of associated text information and then displaying the associated input in response to user input (allowing users to look up information about places marked on a map), and (3) providing "text search" and "text browse" features that allow a user to select a place and then display the portion of the map showing the location of that place (or find a place on a map). These are also essentially variations of activities humans have performed for thousands of years using paper maps and other reference works, and are thus abstract ideas. For example, atlases often provide several maps displaying the same place, but with differing scales in order to show varying degrees of detail. These maps are cross-referenced to help a person change the scale of the map being shown, depending on his needs. Atlases and encyclopedias also provide indexes that allow a person to choose a place and then locate either a map showing the location of that place or textual information about that place. Like the claims of the '437 patent, the claims of the '018 patent are directed to an abstract idea.

The abstract ideas set forth in this patent are comparable to the concept of collecting, storing, and retrieving data found patent-ineligible in several recent cases. *See, e.g., Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. Dec. 23, 2014) (invalidating patent claims "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because "[t]he concept of data collection, recognition, and storage is indisputably well-

known. Indeed, humans have always performed these functions."); *Bascom Research, LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 949 (N.D. Cal. Jan. 5, 2015) (invalidating claims describing "the abstract idea of creating, storing, and using relationships between objects" because "the concept of establishing and using relationships between documents is a common, age-old practice"); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813, 823 (E.D. Va. 2014) ("[S]toring and querying information in a database, and building reports based on that information, is one of the most basic functions of a database system."); *Cogent Med., Inc. v. Physicians Interactive Holdings, Inc.*, 70 F. Supp. 3d 1058, 1063-64 (N.D. Cal. 2014) (invalidating claims directed to "the abstract idea of maintaining and searching a library of information and that "[t]his idea is little different than the basic concept of organizing a physical library so that an individual can search for information by going to the relevant portion of the library and picking a book."). The abstract concept of collecting, storing, and retrieving data simply is not patent-eligible.

Furthermore, in opposition to Dickstein Shapiro's assertion that the claims at issue are directed to an abstract idea, EB argues only that the patents survive § 101 scrutiny because they are directed to improving the functionality and operability of a computer itself. However, the Court finds—as did the Supreme Court—that this argument is irrelevant at this step of the inquiry. *See Alice*, 134 S. Ct. at 2359 (considering whether the claims "purport to improve the functioning of the computer itself" as part of the second step of the § 101 inquiry). EB offers no other challenge to Dickstein Shapiro's position that the claims are abstract.[1]

2. Step Two

---

[1] EB's argument also sets forth apparent estoppel arguments at various points, notwithstanding this Court's Opinion of November 26, 2012, ECF No. 64. EB asserts that Dickstein Shapiro's present assertions should be rejected based on previous statements made in PTO filings. However, the Court already rejected this argument, finding no basis for the application of judicial estoppel based on statements that Jon Grossman made to the PTO on behalf of EB in his capacity as EB's attorney. ECF No. 64 at 6-11. Additionally, to prove its case-within-a-case, EB must rely on evidence that would have been admissible in the underlying case. In the underlying case, EB could not have established that its patents were valid simply by arguing its lawyers said they were valid.

Because the claims at issue are directed to the abstract idea of collecting, storing, and retrieving data, the Court must turn to step two and "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (quotation marks and citations omitted). Transformation into a patent-eligible application requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* (brackets and citations omitted).

The '437 does not contain such an "inventive concept." The patent claims include hardware limitations—specifically, the use of a "computer" and "computer-readable medium." While the parties disagree about the precise scope of these terms, even the narrowest construction hardly provides any real limitation. The patent also requires that the database be searchable by textual browse entry paths, textual search entry paths, and graphics entry paths, as described earlier. But these requirements simply describe various methods by which humans have organized and searched for information for hundreds if not thousands of years. The "textual browse" entry path is functionally equivalent to using an index to search a printed reference work. The "textual search" feature is no different than a person scanning the text of a book to find a particular term each time it appears. Obviously, a computer can perform this task much quicker than a human, but that is not sufficient to render the idea patentable. *See CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc plurality opinion of Lourie, J.) ("[S]imply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility."). Not only have humans long used these methods of categorizing and searching information, but the patent itself suggests that textual browsing and searching were conventional methods of searching

databases used in prior art. *See* '437 Patent at 1:49-2:9 (describing textual browse and search entry paths in *Grolier* CD-ROM-based encyclopedia).

The patent does not define the term "graphical search," but it gives examples that explain what this concept means. It explains that the "Picture Explorer" entry path accesses information in three ways: "(1) by allowing a user to randomly browse through a collection of pictures, (2) by displaying a list of captions and enabling a user to select corresponding pictures, or (3) by allowing a user to enter a description of the picture which then triggers the entry path to automatically search the terms of that description for corresponding picture captions." '437 Patent at 7:5-12. The first of these modes, randomly browsing through pictures, is no different than a person flipping through the images in a print encyclopedia. The second and third modes are simply versions of the textual browse and textual search functions where the search is limited to picture captions rather than the entire text.

Finally, the claims also require the use of "indicators" that inform users when there is "associated" graphical or textual information and allow the user to retrieve that information. This form of cross-referencing has long been a feature of print encyclopedias. *See Bascom*, 77 F. Supp. 3d 940 ("[T]he concept of establishing and using relationships between documents is a common, age-old practice."). The prior art cited in the patent also demonstrates that the use of indicators (such as icons) is a routine and conventional method of linking one item to another for retrieval.

In sum, the claims of the '437 patent direct a user to utilize the computer to perform "routine, conventional" organization, storage, search, and retrieval functions described "at a high level of generality." *Ultramercial*, 772 F.3d at 715-16. Simply describing routine computer functions does not provide the required "inventive concept."

Nor do the limitations of the '018 patent provide an "inventive concept." The claims at issue essentially direct a user to utilize computer processes to perform tasks that a person could do with an atlas or other reference work. As stated above, the step of "changing the portion of the map displayed on the display screen in response to user input" is analogous to a person using the cross-references in an atlas to flip from one map of a place, to another map of that place showing more or less detail. Again, the specification notes that displaying a map on a screen and allowing the user to change the portion being displayed was well-recognized at the time of the claimed invention. *See* '018 Patent at 1:56-59 ("For example, The World GeoGraph computer program provides a graphics based atlas exploration program where a user can search through multiple layers (each layer having a greater degree of detail) of an on-screen map.")).

For the same reasons, using "indicators" to show the position of a place on a map and indicate the availability of further information about the place is not an inventive concept. Printed maps commonly include symbols indicating the position of important places on maps which can easily be looked up in an index for further information.

Finally, the patent describes finding places on a map using the "text search" and "text browse" features. For the same reasons these features did not provide an inventive concept in the '437 patent, they do not provide an inventive concept here. Searching and browsing are routine, conventional computer functions, and here they are used solely as the computer equivalent of looking up a place in the index of an atlas and then turning to the correct page.

Like the '437 patent, the '018 patent has some hardware limitations as it requires the use of a "computer," a "computer readable storage medium," and a "display screen." But as discussed, these generic computer components are insufficient to transform an abstract idea into patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2357-60.

Considering all the limitations together as an ordered combination, the claims here do nothing more than instruct a user to view a map, find places on a map, and look up information about places on the map, using conventional search and retrieval functions described "at a high level of generality." *Ultramercial*, 772 F.3d at 716.

EB argues that the patents survive § 101 scrutiny because they are "directed to improving functionality and operability of a computer itself." Pl.'s Opp'n at 6-7. But the claims do not purport to describe any new computer hardware or a way of improving the performance of existing hardware. They merely describe, in general terms, types of software applications that could be run on a computer to store, search, and retrieve information from a database. This is similar to the claims rejected by the Federal Circuit in *Content Extraction*, which described software for recognizing and extracting data from a hard copy document, and *Ultramercial*, which generally described a system for distributing copyrighted content over the Internet using advertisements as currency. *See Content Extraction*, 776 F.3d at 1346-49; *Ultramercial*, 772 F.3d at 713-17. Furthermore, the fact that the hardware is described in such general terms shows that these are software claims, not improvements to the computer itself.

EB's reliance on *DDR Holdings* is misplaced. The patents at issue in *DDR Holdings*, a rare case in which the Federal Circuit has affirmed subject matter eligibility post-*Alice*, were directed to systems and methods for generating a composite web page that would combine certain visual elements of a "host" website with content from a third-party merchant. The idea was to combine the logo, background color, and fonts of the host website with product information from the third-party merchant to prevent the third-party merchant from luring away the host website's visitor traffic. *DDR Holdings*, 773 F.3d at 1248. The Federal Circuit held that unlike the claims at issue in *Alice* and similar cases, these claims "do not merely recite the performance of some business

practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257. EB argues that the patents solve a problem specifically arising in computer technology. Pl.'s Opp'n at 17. But the fact that multimedia information is comprised of binary code does not change the basic idea behind this patent, and *Alice* and its progeny make clear that simply adding references to computer technology will not save a claim that, at its core, is directed to an abstract idea. As already discussed, storing, searching, and retrieving data from a database is not a problem specific to computers, but one humans have grappled with for centuries.

Furthermore, claims must be drawn with enough specificity that they do not preempt ever application of the underlying concepts. *See Alice*, 134 S. Ct. at 2354. The claims at issue here—unlike those in *DDR Holdings*—do not outline a specific way to manipulate the computer to achieve a particular result. They simply describe in broad and generic terms particular search functions that could be included in a software application. The potential preemptive power of such claims are illustrated by EB's current litigation efforts, which attempt to reach a variety of new technologies such as satellite navigation systems.

Finally, EB argues that the claims are patentable because they constituted a technological "break-through" or a concept previously "unimaginable." Pl.'s Opp'n at 18. However, this "argument misses the point. The concern of § 101 is not novelty but preemption." *Amdocs*, 56 F. Supp. 3d at 825. *See also DDR Holdings*, 773 F.3d at 1257 (specifically noting that the novelty of the claims—describing a method that was previously unknown and never employed before—was not alone sufficient to render its claims patent-eligible). Even assuming the claims at issue were

novel, this does not make them patent-eligible under § 101: The claims at issue are simply too broad and abstract to meet the requirements for eligibility under § 101 of the Patent Act.

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion for judgment on the pleadings is GRANTED. Because the Court finds that the claims at issue are not patent-eligible under § 101, EB has lost the case-within-a-case it needed to prove in order to prevail on its malpractice claim. Therefore, no further litigation is necessary and the other pending motions will be DENIED as moot.

This case will therefore be DISMISSED. A separate order consistent with this Opinion shall issue on this date.

Signed by Royce C. Lamberth, United States District Judge, on August 26, 2015.